## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| NAPOLEON BURKE, **PLAINTIFF,** | * | CIVIL ACTION 3:12-cv-746-WHA |
| | * | |
| v. | * | **FILE NO.** |
| | * | |
| | * | **JURY TRIAL DEMANDED** |
| UPPER CRUST FOOD SERVICE, L.L.C. and ADAM GUY **DEFENDANTS** | * | |

## COMPLAINT

COMES NOW Napoleon Burke, hereinafter Plaintiff, and brings this action as against Upper Crust Food Service, LLC, and Adam Guy hereinafter "Upper Crust", "Guy", Defendant or Defendants, and for cause respectfully shows as follows:

### NATURE OF ACTION

1.

This action is filed 42 U.S.C. § 1981 ("1981").  Plaintiff also seeks an award of costs and attorney's fees for prosecuting this action as provided by 42 U.S.C. § 1988.

2.

Plaintiff seeks monetary damages for lost pay and benefits, mental and emotional suffering, punitive damages, and a declaratory judgment that Defendants intentionally discriminated, and retaliated against him on account of his race in violation of 42 U.S.C. § 1981.

3.

Plaintiff also brings this action pursuant to Section 16(b) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et. seq. ("FLSA"), for unpaid wages, unpaid overtime compensation, prejudgment interest, liquidated damages, attorney's fees, and costs.

4.

Plaintiff, as a nonexempt employee, is a true Plaintiff, and shows that Defendants have failed to compensate for all hours worked in excess of forty (40) hours each work week at one and a half times his regular rate of pay.

## JURISDICTION AND VENUE

5.

The jurisdiction of this Court is invoked pursuant to 29 U.S.C. §216(b), and 28 U.S.C. §1343(4). This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343 as it presents a federal question. Defendant Upper Crust is a corporate

citizen of the state of Missouri, with corporate headquarters located therein, and derives substantial revenue from services rendered in this State through, inter alia, facilities and employees located in the Middle District of Alabama.

6.

Venue is proper in this District because the facts giving rise to this action largely occurred in the Middle District of Alabama, the witnesses to such facts are located therein and Defendant has maintained a corporate presence therein at all times germane hereto.

## PARTIES

7.

Plaintiff, is an African American male, and is a former employee of Defendants. He was an employee as defined by 28 U.S.C. § 203(e), and despite any honorific or descriptive title, he was actually a non-exempt employee by virtue of his duties and work.

8.

Defendant Upper Crust is incorporated in the state of Missouri and it is licensed to do business in the state of Alabama. Alabama is where Upper Crust employed Plaintiff. Defendant LLC, may be served with this Complaint and Summons via its Registered Agent for Service in Alabama: REGISTERED

AGENT SOLUTIONS, INC., 2094 Myrtlewood Drive, Montgomery, Alabama 36111. Member and Co-Defendant, Adam Guy may be served at 111 W. Ridgeley, Columbia, Missouri 65203.

9.

Defendant Adam Guy is an individual and serves as Chief Executive Officer of Defendant Upper Crust; he is a corporate officer with operational control of the corporate Defendant's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.

10.

Defendants are "employers" within the meaning of the FLSA, and the Plaintiff is an "employee engaged in commerce" within the meaning of the FLSA.

11.

Plaintiff is entitled to the protection afforded by the minimum wage and overtime provisions of the FLSA and has standing under Section 16(b) of the FLSA to maintain this action for himself.

## CONDITIONS PRECEDENT TO SUIT

12.

This action is brought pursuant 42 USC 1981, as well as 29 USC 201, et. seq., the Fair Labor Standards Act. To that end, Plaintiff was required to complete

no filings with the EEOC or any other administrative agency in order to maintain the instant action.

## STATEMENT OF THE FACTS

13.

Plaintiff was employed with Upper Class on or about the August 8, 2011.

14.

When hired, Plaintiff had a verbal agreement sealed with a hand shake to go to work as an executive chef of for a salary of $32,000.00 per year plus 51¢ per mile for travel that included, inter alia, commuting from Columbus.

15.

Initially, Plaintiff's job was to prepare, from scratch, sufficient full course meals to service approximately 300 fraternity members, three times a day, at the fraternity's house.

16.

At the time Plaintiff was hired there was a 20 year old white person named Adam Logan also working for the Defendants. Logan did not have the Plaintiff's culinary skills or experience.

17.

Despite the lack of skills and experience, the owners of Defendant Upper Crust, to include Defendant Guy, told Logan that he, not the Plaintiff, would be the executive chef and that Plaintiff would be the Sous Chef.

18.

Sous Chef is essentially a non-exempt position under the FLSA, and the Duties ascribed to the position of Executive Chef by the Defendants were such that the title was meaningless and the duties constituted those of a non-exempt position.

19.

From the start of Plaintiff's employment with the Defendants, there was inability to get the Plaintiff's pay correct according to the original agreement between the parties.

20.

On information and belief, the Defendants were also never able to get the pay right with Adam Logan; as a result, Logan quit shortly after the Defendants opened.

21.

Plaintiff's position required him to work about 60 to 85 hours per week, and he was told by corporate representatives that he was to be paid $25,000 per year as a sous chef, rather than the $32,000 executive chef salary originally agreed.

22.

Eventually Plaintiff left the Defendants' employ because they would not pay him: mileage as per the original agreement; , the salary agreed upon originally in the initial agreement; and furthermore, after notifying the Defendants of his resignation, and after he had effectively resigned, the Defendants paid him an hourly wage of $12.00 an hour, for his last four days of work.

23.

After his resignation, he was replaced by two (2) young white employees. Both of these employees have since resigned, and on information and belief they too have sought legal counsel and are pursuing remedies against the Defendants for unpaid wages.

24.

The Defendants' treatment of Plaintiff, has given rise to an actionable claim under FLSA for back wages and mileage pay, as well as a racial discrimination claim under 1981.

25.

On June 7, 2011, Plaintiff initially spoke to Roy Dubose regarding a job via telephone.

26.

On June 19, 2011, Plaintiff was interviewed at the Chili's in Opelika, AL; and he was hired by Roy Dubose.

27.

At the time he was hired, Plaintiff was told that terms of his employment would be emailed to him; he was also informed that the new hire paperwork would be emailed at that time. He was to fill it out prior to starting work the second week in July.

28.

On July 17, 2011, Plaintiff met with Roy Dubose in Auburn, AL. Plaintiff also met Adam Guy and Carl Gardner at that meeting. Adam Logan was also present at the time of the meeting. Adam and the Plaintiff cleaned the kitchen of the fraternity house while the Upper Crust's owners, to include Defendant Guy, gave presentations to the Presidents of two fraternities. Plaintiff was not compensated at all for this labor.

29.

On August 8, 2011, Plaintiff began formally working for Upper Crust.

30.

Plaintiff, along with Adam Logan worked from August 8-11, 2011, with Adam Logan, cleaning the kitchens of the two fraternity houses, receiving deliveries of food items and equipment, and preparing for first meal to be served on August 12, 2011.

31.

Roy Dubose arrived Friday morning, and Upper Crust, via the Plaintiff and other agents, served their first dinner for Pi Kappa Phi members and their families on the evening of Friday, August 12, 2011. Defendant Adam and other executives were also present.

32.

On August 10, 2011 Plaintiff received the US Foods order guide via email from Dubose, as well as menu rotation. Plaintiff was given a food service plan that outlined what was expected at each meal period with breakfast being served from 8:00 AM to 9:00 AM, lunch from 11:00 AM to 1:00 PM, and dinner from 5:00 PM to 6:00 PM. A menu rotation was provided for lunch and dinner that followed an 8 week rotation.

33.

At the time they received this information, The Plaintiff and Logan were the only employees on the ground in Alabama, though there were other employees in Missouri.

34.

The Plaintiff was instrumental in regularly serving 75 members being of Pi Kappa Phi and 80 members of Pi Kappa Alpha.

35.

On August 17, 2011, the Semester began at Auburn University. Plaintiff and Logan were tasked to serve breakfast, lunch, and dinner Monday thru Thursday, with just breakfast and lunch being served Friday. Sundays were one meal a day.

36.

Initially, Upper Crust and the Plaintiff served only two fraternities: Pi Kappa Phi and Pi Kappa Alpha. They were provided a weekly budget for ordering for those two houses on August 15, 2011.

37.

August 26, 2011, was to be the first pay day for Plaintiff. However, payroll was not processed until August 31, 2011.

38.

On August 30, 2011, Plaintiff spoke with Roy Dubose regarding hiring a
second chef to replace Logan who was leaving the company.  Dubose stated that he
was considering increasing Plaintiff's salary in lieu of hiring another chef.
Plaintiff agreed that he could handle the responsibilities of management as long as
the promised kitchen employees were hired expediently.

39.

Plaintiff and Dubose did not discuss what the increase in salary would be at
the time as Dubose was to discuss the plan he and Plaintiff had arrived at with
Adam Guy.

40.

On September 2, 2011, Plaintiff received his first paycheck covering the
dates August 8, 2011 to August 21, 2011; upon seeing the same, Plaintiff sent an
email to Dubose and Defendant Guy.  Plaintiff informed them in the email he
would not be able to work in his current capacity for $25,000 per year; he
reminded them that was not the salary agreed upon.

41.

Plaintiff revealed he would like to work out the terms of employment with
the company, but that he would need the terms, as initially agreed upon, in writing.

42.

On September 4, 2011, Plaintiff spoke to Dubose via telephone regarding an email sent September 2, 2011. Dubose apologized for payroll arriving late. Dubose followed up by expressing that he believed the parties had originally agreed to $25,000 per year plus a bonus of $3,500 per semester which would bring Plaintiff's salary to $32,000 a year.

43.

Dubose also stated that a check for Plaintiff's mileage for the first two weeks of work had been sent on Saturday, September 3, 2011.

44.

On September 6, 2011, Dubose forwarded to Plaintiff new hire paperwork, and a time sheet to be completed for payroll.

45.

On September 11, 2011, Plaintiff sent another email to Roy Dubose and Adam Guy addressing payroll issues.

46.

It seems that employees were not paid on September 9, 2011 which was the scheduled pay day. The hours covered for the pay period were personally written down by Dubose when he was in Auburn.

47.

In the September 11, 2011, email Plaintiff addressed the issue of employees being disgruntled and that he did not feel like payroll had been made a priority by the owners of Defendant Upper Crust. Plaintiff also again expressed in the September 11 email that he needed the terms of his employment in writing, to include salary, amount paid for mileage, and milestone achievements needed to qualify for the bonus each semester.

48.

Plaintiff also informed Dubose and Guy in the same email that the mileage check they claimed they had sent him the previous Saturday had never arrived.

49.

On September 13, 2011, Plaintiff Fed Ex'ed wage logs, new hire paperwork, and invoices to Upper Crust using their corporate Fed Ex account, #297-820-532, and the address provided: 108 E. Green Meadows Rd., Ste. 6, Columbia, MO 65203.

50.

On September 18, 2011, Plaintiff forwarded copies of new hire paperwork for Trevor Moorer, and a spreadsheet with employees' clocked hours. Plaintiff also included his mileage for the days traveled since being hired; the mileage log

covered the period between August 12, 2011 and September 18, 2011. It totaled 2760 miles traveled between Fort Benning, GA and Auburn, AL.

51.

On September 19, 2011, Roy Dubose sent a reply to Plaintiff's email of September 18, 2011 acknowledging receipt.

52.

On September 20, 2011, Dubose called and stated the paperwork needed for payroll was not complete; however, Plaintiff received an email from Phyllis (an employee with Upper Crust) explaining what was needed to properly complete that paperwork. Upon receipt of the same, he filled out the time sheet; he then scanned it back to her.

53.

Plaintiff let Phyllis know that one employee's information, Terry Dixon, was missing because Dixon had worked three days, failed to show up to work on the fourth, and had not returned Plaintiff's calls to complete paperwork.

54.

Phyllis replied and stated the time sheet was perfect, and she would send it directly to Plaintiff in the future.

55.

On September 23, 2011, Plaintiff traveled to Auburn in order to turn in keys to the house and do a handoff with Chris.

56.

Plaintiff resigned from the position with Defendants after he received his paycheck on September 23, 2011, and neither mileage nor salary was paid correctly.

57.

On September 27, 2011, Plaintiff emailed Dubose and Adam Guy regarding the mileage pay that was not paid the previous Friday. The total for unpaid mileage to that date was $1,407.60, under the agreement that Plaintiff had originally entered into with Defendants. The September 27, 2011, email also stated Plaintiff would expect a check for the four days he worked prior to his resignation (September 18 through September 22).

58.

On October 4, 2011, Plaintiff emailed Phyllis Kemper regarding the unpaid mileage because he did not receive a reply or phone call from Adam Guy or Roy Dubose regarding the September 27, 2011, email. Plaintiff sent Dubose and Guy a copy of this email

59.

On October 4, 2011, Plaintiff received an initial reply to his October 4, 2011 email from Adam Guy who stated that Plaintiff's agreed upon salary was $20,000 per year when he was initially hired at Upper Crust. Guy's email also stated that Plaintiff's salary was increased from $20,000 to $25,000 to compensate for driving from out of town.

60.

Because the initial salary Roy Dubose and Plaintiff agreed on was $32,000 per year, not $20,000, Plaintiff replied to Guy that while he appreciated the response, what Guy stated in his email was quite different than what Dubose and Plaintiff had agreed upon.

61.

Plaintiff further told Guy that he, Plaintiff, had emailed several other times during his employment, and Plaintiff had never received a reply or terms of employment in writing. Plaintiff further set out that he had worked an 85 hour week for $25,000 a year, averaging to $4.52 per hour after taxes.

62.

Following this, Plaintiff received a second email reply from Adam Guy, in his capacity as owner of Upper Crust; he stated that Plaintiff was not paid mileage because the company does not pay their employees to get to work.

63.

To the extent that when he was hired by Dubose, Dubose did indeed agree to pay travel between Fort Benning and Auburn, Guy was mistaken or Plaintiff was fraudulently induced to enter into Upper Crust's employment.

64.

Guy also allowed that if Upper Crust did ask their employees to travel for work duties, Upper Crust did reimburse those employees. However, Plaintiff used his personal vehicle to transport food and equipment between houses daily and was never reimbursed for that use. Guy's email also stated that Plaintiff was hired at a higher salary rate in order to help with some of his expenses.

65.

On October 27, 2011, Plaintiff contacted counsel regarding the process for claiming owed mileage and wages.

66.

During the first two weeks of the semester, Plaintiff worked with Adam Logan. Plaintiff and Logan worked from open to close everyday as Dubose had not hired a crew to help yet. During this time, Adam's mother in law came in and worked in the kitchen for several days.

67.

Logan's mother-in-law's information and hours were given to Roy, but she was never paid for the time that she worked.

68.

Following Logan leaving the job approximately 2 1/2 weeks into the semester, several cooks were hired who worked numerous hours to include overtime.

69.

There was no time clock in place at the house, but Roy Dubose stated that one was going to be installed. He came to Auburn on several occasions, as did other members of the Upper Crust management. On these occasions, Roy made assurances to various cooks that they would be paid on time and "taken care of". He wrote down their hours, but did not return their calls when their checks arrived late or were short hours.

70.

When Dubose did address payroll issues with the other cooks, he stated that they were not paid because Plaintiff did not turn in their hours or paperwork despite the fact that he had collected information from them in person and that Plaintiff had Fed Ex'ed and emailed the same information to him multiple times.

71.

Dubose never did communicate to Plaintiff what payroll procedures were or that Plaintiff was not fulfilling this responsibility.

72.

Several of the people that Roy hired were hired over the phone rather than in face to face interviews. The kitchen employees hired were all promised $10.00 per hour with no late nights and no weekends.

73.

Following Adam Logan's leaving the company, Chris Shaw was hired and worked numerous overtime hours, as Plaintiff and Shaw ran the operation from open to close each day.

74.

Ultimately, prior to Plaintiff's resignation, five other cooks hired, but these cooks all had other jobs. None were full time employees.

75.

Employees of Upper Crust at Plaintiff's location used their personal vehicles to deliver food and supplies from one house to the next. Similarly, these employees also used our personal cell phones to communicate during the day when at different houses, as well as to communicate with Roy Dubose and to place orders at US Foods because there was no business phone line available for use.

76.

Also during this period, Upper Crust signed contracts with two other fraternity houses at Auburn University which added to the workload.

77.

Because of pay issues, it was difficult to keep employees satisfied and several became disgruntled before they had been fully trained and a good system for employee scheduling could be developed.

78.

Plaintiff was responsible for training new employees, keeping track of hours, ordering all items from US Foods, ensuring that meals were served on time and of good quality, ensuring cleanliness of the kitchens in each house, and interacting with the Presidents of each fraternity to ensure that their needs were met.

79.

In addition to those duties stated above, Plaintiff did all cooking for each house as none of the employees hired by Dubose had the experience or skill to cook quality meals at the volume necessary. These employees, including Adam Logan who was hired as a chef and put in charge of Plaintiff, were used to transport items from house to house, wash dishes, prep some basic kitchen items, set up serving lines, and clean.

80.

Plaintiff had a good relationship with the US Foods representative, Paul Hufstedler, as well as other vendors. Plaintiff received personal recommendations for employment from the then President of the Pi Kappa Alpha fraternity, Adam Sewell, as well as Paul based on his performance while with Upper Crust.

81.

During Plaintiff's employment, there were several instances where Dubose was rather disrespectful in his interactions not just with Plaintiff, but with other employees and vendors.

82.

Although Plaintiff had much more experience (15 plus years more) in kitchen management than Adam Logan, Plaintiff was told during his first week of

employment that Adam would be in charge. Plaintiff would be his assistant. Logan told Dubose, and later reiterated to Plaintiff, that he was not ready for that responsibility.

83.

Adam Logan and Plaintiff worked well together as the agreement was to let Dubose think Logan was in charge, and Plaintiff would teach Logan as they progressed in the semester.

84.

Logan and Plaintiff were both promised the same higher salary that was not paid, and in the end both were paid $25,000 per year despite the obvious differences in their experience and capabilities.

85.

Plaintiff was hired as a chef in response to an ad stating that a 'from scratch' company was hiring an Executive Chef. The ad promised good working hours, top compensation, and paid summer vacations.

86.

In later conversations with Dubose, after already starting work, when Plaintiff voiced to him that he, Plaintiff, was not being paid what was agreed upon, Roy informed Plaintiff that even his corporate chefs were not making $32,000 per

year though they had been with the company for some time. Dubose stated that their bonuses made up for it, but Plaintiff never received bonus structure information from him.

87.

Plaintiff worked from approximately 5:30 am until 8:30 or 9:00 pm four days a week and 8 hours a day on Friday and Sunday for the entire duration of his employment as the staff was never in place for him to work five (5) ten (10) hour days as initially agreed.

88.

To the best of Plaintiff's knowledge, information and belief, none of the original employees who opened the operation for Upper Crust are still employed by the company.

89.

To the best of Plaintiff's knowledge, information and belief, not one of the original employees was compensated fully or fairly for their time despite their efforts.

90.

The task at hand to serve four fraternity houses was definitely not a two man job; based on Plaintiff's previous experience, the task was reasonably a ten man

job. This would be reasonable in order for employees and managers to be given reasonable time off and so that they could work 50, rather than 85, hour weeks for their salary.

91.

Plaintiff received the following remuneration during the course of his employment with Defendants:

a.  For August 8, 2011, to August 21, 2011, he received a total of $961.54; Plaintiff worked approximately 85 hours a week, each week, during this period.

b.  For August 22, 2011, to September 4, 2011, he received a total of $961.54; Plaintiff worked approximately 85 hours a week, each week, during this period.

c.  For September 5, 2011, to September 18, 2011, he received a total of $961.54; Plaintiff worked approximately 85 hours a week, each week, during this period.

d.  For September 19, 2012, to October 2, 2011, Plaintiff was paid $384.64; this represents a total of 12.04 per hour for the 32 hours worked during this pay period.

92.

During the course of his employment, Plaintiff performed his duties to the best of his abilities and in good faith.

93.

During the course of Plaintiff's employment, Defendants acted in bad faith and in a willful and wanton manner that was in reckless disregard to Plaintiff's federally protected rights to be free from discrimination in employment on account of his race, and in violation of the Fair Labor Standards Act.

## CAUSES OF ACTION & THEORIES OF RECOVERY

### COUNT I

### 42 USC 1981 – Race Discrimination

Plaintiff incorporates by reference the allegations contained in the above paragraphs as if fully stated herein.

94.

Defendants' action complained of herein have violated Plaintiff's rights to be free from race discrimination with regard to the terms and conditions of his employment.

95.

Plaintiff is entitled to equitable and monetary relief for Defendant's violation of 42 USC 1981.

## COUNT II

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

Plaintiff incorporates by reference the allegations contained in the above paragraphs as if fully stated herein.

96.

By the above-stated acts, Defendants violated the Equal Pay Act, 29 U.S.C. §§ 201, et seq., and deprived Plaintiff of pay for work to which he was legally entitled.

97.

Because Defendants violated the Equal Pay Act, Plaintiff is entitled to damages, with interest to date, and attorneys' fees and costs for bringing and litigating this action, under the Fair Labor Standards Act.

## COUNT III

## PUNITIVE DAMAGES

Plaintiff incorporates by reference the allegations contained in the above paragraphs as if fully stated herein.

98.

Defendants' actions constitute willful misconduct, demonstrating wantonness, oppression, and the entire want of care which would raise the presumption or conscious indifference to the consequences that entitle Plaintiff to recover punitive damages pursuant to 42 USC 1981 & the FLSA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays as follows:

a) that Summons issue and Defendants be served as by law provided;

b) that Plaintiff be awarded judgment in his favor with respect to all contentions in his Complaint;

c) that Plaintiff be awarded actual and liquidated damages as proven at trial;

d) that Plaintiff be awarded compensatory damages for mental and emotional suffering in an amount to be determined by the enlightened conscience of an impartial jury;

e) that Plaintiff be awarded punitive damages in an amount to be determined by a jury at trial to be sufficient to prevent such conduct as alleged herein from occurring in the future and commensurate with the harm done to Plaintiff;

f) that Plaintiff be awarded reasonable attorney's fees and expenses of litigation;

g) that all issues triable by jury be tried by a jury;

h) that all costs of this action be taxed to Defendants; and

i) for such other and further relief as unto this Court may seem just and
equitable in the premises.

This 24th day of August, 2012.

John W. Roper
*(Pro Hac Vice forthcoming)*

John W. Roper
5353 Veterans Parkway, Suite D
Columbus, Georgia 31904
(706) 596-5353
johnroper@roperlaw.com
Georgia Bar No: 614159